Orszulak v David (2024 NY Slip Op 51618(U))

[*1]

Orszulak v David

2024 NY Slip Op 51618(U)

Decided on November 26, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 26, 2024
Supreme Court, Kings County

Beata Orszulak, as Administratrix of the Goods, Chattels and Credits 
 of Bogdan Orszulak, deceased, Plaintiff,

against
Marian David, M.D., Raul Vilca, M.D., Marian David, M.D., P.C., 
 NYHQ-Marian David Comprehensive Cardiology, Danuta Kurstein, M.D., Danuta Kurstein, M.D., P.C., and Greenpoint Doctors Mgt., Inc., Defendants.

Index No. 519269/2019

Plaintiff
Sharon Izrailov, Esq. 
Zucker & Regev, P.C.
186 Joralemon St., Suite 1010
Brooklyn, NY 11201
718-624-1211
Defendants Marian David M.D., Raul Vilca M.D., Marian David M.D. P.C., NYHQ-Marian David Comprehensive Cardiology
Jeffrey Alan Learn, Esq.
Helwig Henderson & Gray
6800 Jericho Tpke, Ste 202e
Syosset, NY 11791
516-747-9700
Defendants Danuta Kurstein M.D., Danuta Kurstein M.D. P.C.
Ivelina Popova, Esq.
Garson & Jakub LLP
29 Broadway, Suite 1300
New York, NY 10006
646-863-8980

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review: NYSCEF 
#s:
Seq. 1: 51 — 52, 53 — 72, 92 — 94, 95, 100 — 101
Seq. 2: 73 — 75, 76 — 89, 96 — 98, 99, 102 — 103
Defendants Marian David, M.D. ("Dr. David"), Raul Vilca, M.D., Marian David, M.D., P.C., and NYHQ-Marian David Comprehensive Cardiology move (Seq. No. 1) for an Order, pursuant to CPLR 3212, granting summary judgment to Dr. David [FN1]
and dismissing the claims against him.
Defendants Danuta Kurstein, M.D. ("Dr. Kurstein") and Danuta Kurstein, M.D., P.C.[FN2]
separately move (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all claims against them.
Plaintiff opposes both motions.
Plaintiff commenced this action on August 30, 2019, asserting claims of medical malpractice and wrongful death on behalf of the estate of Bogdan Orszulak ("Decedent"). Plaintiff's bill of particulars asserts claims of malpractice from approximately January 2018 through the date of Decedent's death on September 3, 2018. As such, the Court limits its decision herein to the alleged malpractice that occurred on those dates, and not any additional claims raised for the first time only in opposition to this motion.
Prior to his death, Decedent's medical history included hypertension, hyperlipidemia, and pre-diabetes. Decedent first saw Dr. Kurstein as a primary care physician on April 30, 2003, at which time his blood test revealed elevated cholesterol and triglycerides. He saw Dr. Kurstein for multiple follow-up appointments from 2003 through 2018. In April 2006, Dr. Kurstein prescribed Crestor, a cholesterol-lowering medication. On subsequent visits, she also prescribed Diovan (to treat hypertension) and Aspirin (as a blood thinner), noting his non-compliance with the medications. She also recommended diet changes. Dr. Kurstein first referred Decedent to cardiologist Dr. David for a cardiovascular evaluation in August 2012, and he reported normal/negative findings for ischemia or obstructive disease. Dr. Kurstein referred Decedent for another cardiovascular evaluation in January 2016 and June 2017, but there is no record of a follow up from those referrals.
On January 3, 2018, Dr. Kurstein saw Decedent for a routine follow-up visit. His most recent blood test on December 9, 2017 showed high total cholesterol (268) and low-density lipoprotein cholesterol (197). His lungs and heart were clear on examination, and he reported no chest pains, shortness of breath, or dizziness. Decedent had lost some weight and reported he was on a low-carb, high-fat diet, though Dr. Kurstein advised changing to a low-cholesterol diet. She referred him to Dr. David's practice for a cardiovascular evaluation.
On February 24, 2018, Decedent was examined by Raul Vilca, M.D. ("Dr. Vilca") at the [*2]office of Marian David, M.D., P.C. Decedent complained of recent shortness of breath, fatigue, and chest pains radiating to his back. Decedent admitted to not taking his prescribed hypertension or hyperlipidemia medications for the past six months. Dr. David electronically signed Dr. Vilca's notes from the February 24, 2018 visit, though his signature is dated over a year later. Dr. David testified he did not see the patient on that date and only looked at the note and closed it administratively after this action was commenced.
Dr. Vilca conducted a stress test on March 3, 2018. Dr. David interpreted the echocardiogram/ultrasound of the stress test as "normal" and negative for ischemia (reduced blood flow) at peak exercise. His report stated the findings as "normal left ventricular contractility augmentation and no overt evidence of ischemia," ejection fraction 60% (normal range) after the patient had reached 93% of target heart rate. Dr. David testified that he was not involved in Decedent's treatment or care, including the performance of the stress test, apart from this interpretation of the echocardiogram.
On August 24, 2018, Decedent was seen by Dr. Kurstein again. He reported he was feeling well and that he was not taking any of his medications. On examination, his lungs were clear, and his heart was regular with no gallops or abnormalities. Blood test results on August 25 showed elevated glucose (100), total cholesterol (253), and low-density lipoprotein cholesterol (183).
On September 3, 2018, Decedent lost consciousness while receiving a massage and was taken by ambulance to Richmond University Medical Center. Emergency resuscitation efforts failed, and he was pronounced dead from cardiac arrest. An autopsy determined his cause of death as atherosclerotic cardiovascular disease.
Plaintiff alleges that the defendants failed to timely and properly diagnose and treat Decedent for atherosclerotic coronary artery disease. Specifically, Plaintiff alleges that Dr. Kurstein should have ordered or referred him for further cardiovascular testing such as angiography and failed to address Decedent's non-compliance with his medication. Plaintiff alleges that Dr. David failed to properly supervise and interpret the March 3, 2018 stress test. Plaintiff further alleges that each defendant's departures were a proximate cause of Decedent's cardiac arrest and death.
In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v [*3]Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].
Furthermore, a physician is liable for malpractice only where there is a duty owed to the patient, and that duty "may be limited to those medical functions undertaken by the physician and relied upon by the patient" (Romanelli v Jones, 179 AD3d 851 [2d Dept 2020] [internal citations omitted]; see also Covert v Walker, 82 AD3d 825 [2d Dept 2011]).
"In the absence of some recognized traditional legal relationship such as partnership, master and servant, or agency, between physicians in the treatment of patients, the imposition of liability on one for the negligence of the other has been largely limited to situations of joint action in diagnosis or treatment or some control of the course of treatment of one by the other" (McAlwee v Westchester Health Assoc., PLLC, 163 AD3d 549, 552 [2d Dept 2018], quoting Kavanaugh v Nussbaum, 71 NY2d 535 [1988] [emphasis added]).
It is also well established that a primary care physician "may satisfy his or her duty of care to a patient by referring the patient to a specialist who is better equipped to handle [the patient's] condition" (Revere v Burke, 200 AD3d 1607 [4th Dept 2021], citing Perez v Edwards, 107 AD3d 565, 566 [1st Dept 2013], lv denied 22 NY3d 862 [2014]). The referring physician is entitled to rely on the treatment provided by such specialists and does not have a duty to oversee or review the specialist's determinations (see Aaron v Raber, 188 AD3d 967 [2d Dept 2020]; Dixon v Chang, 163 AD3d 525 [2d Dept 2018]. Whether a physician owes a duty to the patient is generally a question of law to be determined by the court, not an issue of fact subject to conflicting expert opinions (Burns v Goyal, 145 AD3d 952 [2d Dept 2016]).
In support of his motion, cardiologist Dr. David submits an expert affirmation from David L. Coven, M.D. ("Dr. Coven"), a licensed physician. Dr. Coven has established his qualifications to opine on the medical treatment at issue, as a specialist certified in cardiovascular disease and interventional cardiology at the time of the treatment at issue.
Plaintiff's bill of particulars alleges malpractice against Dr. David from approximately March 3, 2018 through Decedent's death on September 3, 2018. He had one prior examination of Decedent in August 2012, which is briefly addressed in the moving and opposition papers, but there were no claims regarding this treatment asserted in the bill of particulars, and therefore it is not part of the Court's consideration in this motion.
With respect to the stress test on March 3, 2018, Dr. Coven opines that there were no departures from the standard of care in the treatment and care rendered to Decedent by Dr. David. Dr. David testified that he did not see Decedent on that date, and that it was Dr. Vilca who conducted and supervised the stress test. He testified that his own involvement was limited to "the formal interpretation and sign-off on the worksheet of the ultrasound part of the test" (Dr. David deposition tr, at 60). According to the testimony of both physicians, Dr. David did not conduct, observe, or supervise the stress test, nor did he view or interpret the EKG from the test. Dr. Vilca testified that his own role at the practice was to act as a treating cardiologist, and that he examined the patient on February 24, 2018, scheduled and supervised the March 3 stress test, reviewed the patient's EKGs, and assessed his condition overall.
Dr. Coven opines that the goal of a stress test is "to push the patient to reach 85% of the target heart rate," and there is no standard mandating "how long the test should last," though they ordinarily last three to four minutes. Based on the record and Dr. David's report, Dr. Coven [*4]states that Decedent exercised for six minutes and nine seconds,[FN3]
using the "Bruce protocol" of increased exertion, and reached 93% of the target heart rate, which he opines is within the standard of care. He further opines, based on his own review of the ultrasound, that Dr. David appropriately interpreted the echocardiogram results showed normal function at peak exercise and no evidence of ischemia. Dr. Coven opines that the stress test revealed no evidence of "any occlusion of an artery such as to support a diagnosis of coronary artery disease." Thus, the expert opines that Dr. David's interpretation of the stress test echocardiogram did not depart from the standard of care.
Dr. Coven further notes that additional tests were performed by Dr. Vilca during the March 3, 2018 visit, including a resting metabolic rate test, an ankle-brachial index test, and a pulmonary function test, but that Dr. David had no role in any of this assessment, treatment, or testing.
Dr. Coven also addresses the fact that Dr. David's signature appears on the chart from Decedent's return to Marian David, M.D., P.C. on February 24, 2018, but that signature is dated September 11, 2019, over a year after treatment and in fact after the patient's death and commencement of this action. Based on the testimony of both physicians, the expert states that on February 24, 2018, Dr. David had "no involvement with the patient" and the assessment and examinations on that date were performed by co-defendant Dr. Vilca. Dr. Coven opines was not "responsible for what transpired at the time of the visit with Dr. Vilca" and had no supervisory role over him.
Additionally, Dr. Coven opines that Dr. David's alleged departures from the standard of care were not a proximate cause of Decedent's injuries or death. In the expert's opinion, there was no evidence in the stress test ultrasound images of any occlusion of the artery or signs of atherosclerotic cardiovascular disease. Therefore, nothing about his interpretation of those images could have resulted in earlier diagnosis or treatment.
Based on the submissions, the movant has established that the actual performance and supervision of the stress test, as well as additional testing and treatment decisions, were conducted by treating physician Dr. Vilca. It is undisputed that Dr. Vilca was an employee of the professional practice sued herein as Marian David, P.C. and NYHQ-Marian David Comprehensive Cardiology. However, there is no traditionally recognized employer/employee relationship between Dr. Vilca and Dr. David individually.
Unlike cases involving residents or assistants, the record demonstrates that Dr. Vilca was exercising his independent medical judgment as a cardiologist and not carrying out directives from Dr. David or acting under Dr. David's supervision. There is no evidence that Dr. David participated or took "joint action" in the diagnosis or treatment, or that he exercised any "control of the [alleged] actively negligent physician's course of treatment" (McAlwee v Westchester, at 552; Ross v Mandeville, 45 AD3d 755, 757 [2d Dept 2007]). Dr. David established that he neither participated in the evaluation, testing, or treatment of Decedent on the dates at [*5]issue—apart from interpreting the stress test echocardiogram—nor had any control over the treating physician. Therefore, his individual liability is limited to the interpretation of the echocardiogram.
The movant's expert has established prima facie that Dr. David's interpretation of the stress test echocardiogram on March 3, 2018 was within good and accepted medical standards, and that Dr. David did not depart from the standard of care by interpreting the results to show no evidence of ischemia or coronary artery disease. The expert opines in detail that based on the echocardiogram alone, there were no abnormalities that Dr. David failed to properly detect or report.
Further, the expert's submissions establish prima facie that Decedent's claimed injuries and death were not proximately caused by Dr. David's acts or omissions. The alleged malpractice was limited to interpreting the stress test echocardiogram, which in the expert's opinion did not demonstrate his progressing coronary artery disease.
With respect to the wrongful death claim, Dr. David's expert has established prima facie that there were no underlying departures from the standard of care which proximately caused Decedent's subsequent cardiac arrest and death. Therefore, the movant is entitled to summary judgment on this claim, as an essential element is the wrongful or negligent act which caused the person's death. The burden therefore shifts to Plaintiff to raise an issue of fact for both the medical malpractice and wrongful death claims.
In opposition to both Dr. David and Dr. Kurstein's motions, Plaintiff submits an expert affirmation from a licensed physician [name of expert redacted], certified in internal medicine and cardiology. An unredacted, signed copy of the affirmation was presented to the Court for in camera inspection. The expert has laid a proper foundation to opine on both the internal medicine and specialists in this case.
Plaintiff's expert explains that atherosclerotic cardiovascular disease—Decedent's post-mortem diagnosis—is a "chronic, progressive disease where fatty deposits, known as plaques, build up inside the walls of the arteries." The plaque may harden over time and restrict blood flow, often causing symptoms of chest pain, shortness of breath, dizziness, and fatigue, especially after exertion. The plaque can also break apart and "lead to a sudden blockage in the heart's blood supply, causing a heart attack." Plaintiff's expert further notes that a stress test, where the heart is monitored by echocardiogram under exercise conditions, is a common diagnostic tool for identifying atherosclerotic cardiovascular disease.
Plaintiff's expert opines that the standard of care in performing a stress test is to increase the treadmill speed and incline incrementally via the Bruce protocol, with each stage lasting three minutes. The expert opines that advancing the stages every one minute can lead to "false-negative results," as the patient's heart "does not have enough time to reach and maintain the necessary levels of stress to provoke ischemia or other cardiac abnormalities." The expert states, without citing to evidence in the record, that the test performed on March 3, 2018 failed to follow the three-minute Bruce protocol and used one-minute increments instead. Thus, the expert opines that Dr. David deviated from the standard of care by failing "to recognize and address the procedural flaws" of the stress test, which made the "apparent 'normal' findings" of the echocardiogram unreliable.
The expert also opines that based on Decedent's symptoms of coronary artery disease—chest pain radiating to his back, shortness of breath, and fatigue—and his "high-risk profile" including elevated cholesterol and hypertension, a stress test alone was not sufficient to [*6]rule out cardiovascular disease, and "more definitive testing such as a coronary angiography" should have been ordered or performed.
The expert generally opines that Dr. David had "an obligation to ensure the care documented [by Dr. Vilca] met the standard of practice," and his electronic signature on the February 24, 2018 note indicates that he "implicitly endorsed the care provided by Dr. Vilca" and is liable for any of the latter's deviations from the standard of care.
On the issue of proximate causation, Plaintiff's expert opines that if Dr. David had conducted or ordered an "appropriate follow-up" stress test or angiography, it would have resulted in earlier diagnosis and treatment (such as revascularization) and prevented his death from atherosclerotic cardiovascular disease.
Plaintiff's expert fails to raise an issue of fact sufficient to defeat Dr. David's motion for summary judgment. Throughout the affirmation, Plaintiff's expert asserts opinions on whether the standard of care was followed by "Dr. David and Dr. Vilca" collectively. However, Plaintiff submits no evidence to counter Dr. David's establishment that he had no direct involvement in Decedent's care other than his interpretation and report on the March 3, 2018 stress test ultrasound. An electronic signature (dated over one year later) showing he viewed the notes of another physician does not support the expert's presumption that Dr. David had an obligation to oversee and "note any deficiencies or concerns" on Dr. Vilca's assessment or treatment of the patient on February 24, 2018, nor that he had any supervisory role over the tests performed on March 3, 2018. Thus, the opinions of Plaintiff's expert on whether the standard of care required Decedent to undergo further testing such as angiography are irrelevant to the claims against Dr. David, who was not the treating physician responsible for ordering such tests and had "no further responsibility to independently diagnose the decedent's condition" (Covert v Walker, 82 AD3d 825, 826).
As to the specific claims regarding the stress test, Plaintiff fails to raise an issue of fact that Dr. David deviated from the standard of care in interpreting the echocardiogram. The expert does not dispute the actual findings of the stress test echocardiogram were normal and without signs of ischemia. Instead, the expert argues those results were unreliable due to the flawed or shortened nature of the test. Plaintiff's expert fails to cite to evidence in the record that the Bruce protocol was improperly followed and that Dr. David would be aware of this allegedly shortened protocol from viewing the echocardiogram portion of the test only, which is taken at rest and peak exercise. It is undisputed by the physicians' testimony that Dr. David did not supervise or observe the stress test or monitor the running EKG, and there is no evidence that he would have known from the ultrasound images whether a one-minute or three-minute version of the Bruce protocol was followed. Thus, Plaintiff fails to raise an issue of fact as to Dr. David's alleged departure from the standard of care.
The Court makes no determination on the liability of Marian David, M.D., P.C., NYHQ-Marian David Comprehensive Cardiology, or Dr. Vilca, who did not move for summary judgment herein. The moving defendants acknowledge in their reply that "the professional practice may potentially have some responsibility for Dr. Vilca," but Dr. David is not individually liable for the acts or omissions of a fellow physician in his professional practice (see McAlwee, 163 AD3d 549, 552). There is no evidence in the record that Dr. David assumed a duty of care beyond the interpretation of the echocardiogram portion of the stress test.
As the opinions of Plaintiff's expert are conclusory, speculative, and unsupported by the record, Plaintiff has failed to raise an issue of fact as to Dr. David's interpretation of the [*7]echocardiogram. Plaintiff also fails to raise any genuine issue of fact that Dr. David had any further involvement in diagnosis or treatment decisions regarding Decedent on February 24, 2018 or March 3, 2018, or had any supervisory control over Dr. Vilca. For these reasons, summary judgment must be granted as to the medical malpractice and wrongful death claims against him.
Turning to the motion of Dr. Kurstein, the movants submit an expert affirmation from Brian D. Feingold, M.D. ("Dr. Feingold"), a licensed physician certified in internal medicine. Dr. Feingold has laid a proper foundation to opine on the treatment at issue, setting forth that he is an internist familiar with the applicable standard of care and the signs, symptoms, and risk factors for atherosclerotic coronary artery disease.
Dr. Feingold opines that based on the records that all treatment and care rendered to Decedent by Dr. Kurstein was within good and accepted medical standards. Although the timeframe claimed in Plaintiff's bill of particulars from approximately January 2018 to the time of Decedent's death, Dr. Feingold also addresses Dr. Kurstein's treatment history of the patient from 2003 through 2017 in detail. Plaintiff asserts no claims related to this treatment in the bill of particulars, and therefore no treatment prior to 2018 is part of the Court's consideration in this motion.
Dr. Feingold opines that Dr. Kurstein's evaluation and treatment of Decedent on January 3, 2018 was within good and accepted medical practice. The expert notes that on this visit he reported no chest pains, shortness of breath, or fatigue, and he had normal blood pressure and no abnormalities in his heart or lungs. However, his most recent blood test showed high total cholesterol and high low-density lipoprotein cholesterol. Dr. Feingold opines that, consistent with the standard of care, Dr. Kurstein advised him again to switch to a low-cholesterol diet rather than the low-carb (high protein and fat) diet he had been on. Dr. Feingold also notes that Dr. Kurstein documented he was "unwilling" to start a cholesterol-lowering medication, and he had a history in previous visits of non-compliance with taking his prescribed Crestor medication. Dr. Feingold opines that Dr. Kurstein appropriately referred him for a cardiovascular evaluation based on his risk factors, in accordance with the standard of care.
Dr. Feingold also opines that Dr. Kurstein properly assessed and treated Decedent on his last visit on August 24, 2018. Dr. Feingold notes that he reported he was feeling well with no complaints of chest pains, shortness of breath, or fatigue, and his physical examination was clear of irregular heart rhythm or gallops. Dr. Feingold opines that Dr. Kurstein again appropriately urged Decedent to resume taking Crestor to manage his hyperlipidemia, as she documented he was not taking any of his medications. A blood panel showed his cholesterol was still elevated, slightly lower than the previous results in December 2017. Dr. Feingold opines that these levels were "consistent with all other tests performed over the prior two years," and therefore there was no indication that "urgent intervention" was required by the standard of care, and emergency referral to specialist and/or hospital was not warranted.
Additionally, Dr. Feingold opines that any claims that Dr. Kurstein improperly relied on the cardiologist's report and/or the March 3, 2018 stress test results are without merit. He opines that she followed the standard of care for a primary care physician to rely on "the specialist's conclusions and findings," rather than personally interpret a stress test echocardiogram, determine "the manner in which the test is performed," or order additional invasive tests such as an angiogram, which are "within the purview of a cardiologist and not the internist."
Based on the submissions, Dr. Kurstein has established prima facie entitlement to [*8]summary judgment on the basis that all treatment was in accordance with the standard of care of a primary care provider. The expert opines that Dr. Kurstein was "thorough in her examinations and medical advice" to Decedent, that she prescribed medications for his hypertension and hyperlipidemia at appropriate dosages, that she made referrals for evaluation by cardiovascular specialists, and that she relied on the specialist's impression that Decedent did not have ischemia or other signs of coronary artery disease. Dr. Feingold opines there was nothing further Dr. Kurstein could or should have done in accordance with the standard of care to prevent his cardiac arrest.
As Dr. Kurstein met her prima facie burden on the issue that there were no departures from the standard of care resulting in Decedent's death, she has also established prima facie entitlement to dismissal of the wrongful death claim. The burden therefore shifts to Plaintiff to raise an issue of fact.
In opposition, Plaintiff submits the aforementioned expert affirmation from [name of expert redacted], board-certified in internal medicine and cardiology, which discusses the treatment of each defendant from the standpoint of an internist and cardiologist. A signed, unredacted copy was presented to the Court. As previously stated, any claims of malpractice regarding Decedent's treatment history prior to January 2018 were not asserted in the Plaintiff's bill of particulars and not part of the Court's consideration on this motion.
With respect to primary care physician Dr. Kurstein, Plaintiff's expert opines generally that coronary artery disease is properly managed through "lifestyle changes, medications, and, when necessary, procedures to restore blood flow (revascularization)." The expert opines that in light of Decedent's "symptoms suggestive of an ischemic event" when he presented to Dr. Vilca on February 24, 2018 (including chest pains, shortness of breath, and fatigue), the stress test on March 3, 2018 did not sufficiently rule out coronary artery disease, and Dr. Kurstein failed "to escalate care at this critical juncture" by recommending or ordering a coronary angiography. The expert also opines that although Dr. Kurstein was not a cardiologist, she "had a duty to recognize the significance of Mr. Orszulak's ongoing symptoms and to advocate for more definitive diagnostic measures." The expert opines that definitive diagnosis and intervention at this stage could have prevented Decedent's death by identifying or repairing blockages.
On the final August 24, 2018 visit, Plaintiff's expert opines that Dr. Kurstein departed from the standard of care by not referring him again to a specialist or undertaking "more aggressive management," because his cholesterol levels remained persistently elevated and the current approach was not working.
Additionally, Plaintiff's expert opines that Dr. Kurstein had a duty to address Decedent's non-compliance or unwillingness to take cholesterol-lowering medication, which was documented more than once in her records and testimony. The expert opines that the standard of care when a patient is at high risk for cardiovascular disease is "to explore and address the reasons for non-compliance" and "to explore alternative approaches, such as different medications, patient counseling, or specialist referral."
Based on the submissions, Plaintiff has failed to raise an issue of fact to defeat Dr. Kurstein's motion for summary judgment. The expert does not address any treatment or medical advice provided by Dr. Kurstein on January 3, 2018 or August 24, 2018 or counter the movant's expert opinions, beyond a conclusory statement that Dr. Kurstein had the opportunity "to identify the severity of his condition and escalate care" at that time. The expert also states in a conclusory fashion that in August 2018, the Decedent's persistent high cholesterol "should have [*9]prompted more aggressive management or referral to a specialist." However, the record shows Dr. Kurstein did suggest lifestyle/diet changes, discussed his medication non-compliance and unwillingness to start new medications, and referred him to a cardiologist who evaluated him less than six months earlier. The expert's opinions are vague and conclusory, and they fail to articulate what further steps were required by the standard of care.
Further, as argued by the movants in reply, Dr. Kurstein was entitled to rely on the impressions and findings of the cardiovascular specialist, the performance and results of the stress test, and the determination by Dr. Vilca that more invasive testing such as angiography were not indicated. All these diagnostic and treatment decisions were in the purview of the cardiologists Decedent visited in February and March 2018, on Dr. Kurstein's referral. Whether a physician owes an additional duty to the plaintiff is a question for the court, not one to be determined by the jury based on conflicting expert affirmations (see Burns v Goyal, at 183). Here, it is clear from the submissions that the decisions regarding Decedent's cardiovascular health—including the method of the stress test and the determination on whether he needed more "aggressive" testing such as angiography—were made by Dr. Vilca. It is well established that an internal medicine physician who provides a referral to specialists has "no duty to evaluate the efficacy of that treatment" (Aaron v Raber, at 969). The Court finds that Dr. Kurstein, the referring primary care physician, did not undertake any duty to oversee or question the specialist Dr. Vilca's assessment and order further diagnostic testing for potential coronary artery disease.
For these reasons, there is no genuine issue of fact as to any alleged departures from the standard of care by Dr. Kurstein, and all claims must be dismissed against her.
Accordingly, it is hereby:
ORDERED that Defendant Dr. David's motion (Seq. No. 1) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing all claims against him, is GRANTED; and it is further
ORDERED that Defendant Dr. Kurstein and Danuta Kurstein, M.D., P.C.'s motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all claims against them, is GRANTED; and it is further
ORDERED that the caption be amended to read as follows:
SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF KINGS
X
BEATA ORSZULAK, as Administratrix of the Goods, Chattels and Credits of BOGDAN ORSZULAK, deceased,                         Plaintiff,
-against-
RAUL VILCA, M.D., MARIAN DAVID, M.D., P.C., NYHQ-
MARIAN DAVID COMPREHENSIVE CARDIOLOGY and GREENPOINT DOCTORS MGT., INC.,                          Defendants.
X
The Clerk shall enter judgment in favor of MARIAN DAVID, M.D., DANUTA KURSTEIN, M.D., and DANUTA KURSTEIN, M.D., P.C.
This constitutes the decision and order of this Court.
Dated: November 26, 2024
Hon. Consuelo Mallafre Melendez
J.S.C.

Footnotes

Footnote 1:Dr. David, Raul Vilca, M.D., Marian David, M.D., P.C., and NYHQ-Marian David Comprehensive Cardiology seek summary judgment only as to Dr. David individually and not his associated corporate practice or co-defendant Raul Vilca, M.D., who was at the time of the events an employee of that practice.

Footnote 2:Dr. Kurstein moves jointly for summary judgment in an individual and corporate capacity.

Footnote 3:Dr. David's report stated that the duration of exercise was "5:00 minutes according to the Bruce Protocol," but according to his testimony and on review of the computer printout, the test lasted just over 6 minutes (Dr. David deposition tr, at 67-68; Exhibit O, at 27). Regardless of the test lasting five or six minutes, Dr. Coven opines the length and target heart rate reached were within good and accepted medical standards.